## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **KELVION WALKER,** | § | |
| **Plaintiff,** | § | |
| | § | |
| **vs.** | § | **CIVIL ACTION NO. 3:13-CV-04896-D** |
| | § | |
| | § | |
| **AMY WILBURN,** | § | |
| **Defendant.** | § | |

### PLAINTIFF'S SECOND AMENDED COMPLAINT

**NOW COMES** Kelvion Walker ("Plaintiff"), complaining of Officer Amy Wilburn

("Defendant") and will show unto the Court the following:

### PARTIES AND SERVICE

1.      Plaintiff is a citizen of the United States, the State of Texas, and a resident of

Dallas County, Texas.

2.      Defendant Amy Wilburn was served with summons and has answered and

appeared in this litigation.

### JURISIDCTION

3.      The action arises under the Fourth, Fifth, and Fourteenth Amendments to the

United States Constitution and Title 42 U.S.C. §§ 1983 and 1988.

4.      This Court has jurisdiction under these claims pursuant to Title 28 U.S.C. §§ 1331

and 1343.

### VENUE

5.      Venue is proper pursuant to Title 28 U.S.C. § 1391(b)(1) in that the Defendant

resides and the cause of action arises in the Northern District of Texas, Dallas Division.

## NATURE OF ACTION

6.      This is an action to recover for violations of the Plaintiff's constitutional rights and/or privileges or immunities guaranteed under the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution and Title 42 U.S.C. §§ 1983 and 1988.

## CONDITIONS AND PRECEDENTS

7.      All conditions precedent to jurisdiction have occurred or been complied with.

## FACTS

### OFFICER SHOOTS PLAINTIFF WITH HIS HANDS IN THE AIR

8.      On December 9, 2013 during broad daylight, former Dallas Police Officer Amy Wilburn shot an unarmed Plaintiff who had both his hands in the air, within seconds of encountering him.

9.      Plaintiff, a teenaged student at Grady Spruce High School, was sitting in the passenger's side of a vehicle driven by his friend.

10.     Plaintiff states in his sworn affidavit that only a few minutes before the shooting, he had "gotten into a [maroon-colored] car with my friend . . . No one else was with him. It was just the two of us in the car."[1]

11.     Plaintiff and his friend "drove a minute or so, and then passed some marked police units near the intersection of St. Augustine and Military Parkway."[2]

12.     Plaintiff states that "The police did a 'U-turn'      and got right behind us, and [my friend] said the police were following us. They turned on their lights but not their sirens. I told him to stop because he looked like he wasn't going to stop." [3]

13.     Plaintiff recalls that he was only in the vehicle for no more than "two minutes."

---

[1] Exhibit "1" Affidavit of Kelvion Walker at 1 ¶ 3.
[2] Exhibit "1" Affidavit of Kelvion Walker at 1 ¶ 4.
[3] Exhibit "1" Affidavit of Kelvion Walker at 1 ¶4.

14.     According to media accounts, Plaintiff's friend stopped the vehicle near the intersection of Military Parkway and St. Augustine Road, in the St. Augustine Townhomes.

15.     Plaintiff confirms the location, stating "They followed us and [my friend] turned into a street inside the area where the St. Augustine Townhomes are. [He] then jumped out the car and ran, and the car hit the curb. I remember putting my hands up."[4]

16.     Plaintiff specifically recalls that "While I had both of my hands in the air, I could see the woman officer—whom I later learned was Officer Amy Wilburn—walking up to the car. I remember her walking past the car, and **I had my hands up. Then, she looked at me through the open car door, and I looked at her and she just shot.**"[5]

17.     Plaintiff then saw Defendant who was in her uniform and at all times acting under color of law.

18.     Plaintiff emphasizes that "I had both of my hands in the air the whole time."[6]

19.     Plaintiff emphasizes that "They [his hands] were empty, and I did not see any weapons in the vehicle, and was not about to reach for anything or do anything to resist."[7]

20.     "I just remember yelling to her," Plaintiff states, "What you shoot me for?"[8]

21.     "She came around to my side of the vehicle, and she said something like, 'I'm sorry, I'm sorry. I apologize. I didn't try to.'"[9]

22.     Plaintiff states that

> Before she shot me, she had not said anything, like 'freeze,' or 'put your hands in the air.' She had not said anything at all. She just looked at me, and I looked at her, and then she shot. It happened in a few seconds or less.[10]

---

[4] Exhibit "1" Affidavit of Kelvion Walker at 1 ¶ 5.
[5] Exhibit "1" Affidavit of Kelvion Walker at 1 ¶ 6.
[6] Exhibit "1" Affidavit of Kelvion Walker at 1 ¶ 7.
[7] *Id.*
[8] Exhibit "1" Affidavit of Kelvion Walker at 1 ¶ 8.
[9] Exhibit "1" Affidavit of Kelvion Walker at 1 ¶ 9.
[10] Exhibit "1" Affidavit of Kelvion Walker at 1 ¶ 10.

## PROPERTY MANAGER WITNESSES OFFICER SHOOT PLAINTIFF WITH HIS HANDS IN THE AIR

23.     Scottie Smith II, a property manager and Notre Dame graduate whose vehicle was

about 20 feet away from the incident,[11] described how fast the events unfolded:

> I was sitting outside one of the properties that I manage, waiting on
> a potential tenant and a series of events happened.  First thing that
> happened was that there was an unmarked white car that came
> from behind me that sped past me real fast.  After that car passed
> me there was the red or burgundy car that . . . came in in front of
> me.  There was a young man that hopped out of the car and took
> off running.  The young man that was driving he took off the
> running.  The cop in the unmarked police car ran after him and the
> two cops that were in the cars behind the burgundy car got out of
> their car.
> **They approached the driver's side of the burgundy car, opened
> the door, and well, the lady opened the door and then shot. It
> happened all within 5 seconds tops.**[12]

24.     Smith explained that the teenaged Walker's hands were raised in a surrendering

pose the entire time, stating:

> From the moment that car came into my line of sight the
> passenger, **the one who was shot, had his hands in the air the
> entire time.** . . . His hands were like this whole time from the
> moment that I saw him until the moment that he got shot.[13]

25.     Smith recalled that immediately after the shooting, Wilburn made eye contact

with Smith while he was seated in his car, and that her facial expression exhibited an

understanding that she had just committed a tragic error.

26.     According to a police statement to WFAA, Plaintiff was unarmed throughout the

incident.

---

[11] Smith told *Dallas Morning News* that he was "so close to the scene that if that bullet had missed that young man and would have went out that window, it would have hit my car and probably would have hit me."

[12] Tanya Eiserer and Tristan Hallman, *Man Wounded in Latest Dallas Police Shooting Had His Hands in the Air, Witness Says*, DALLAS MORNING NEWS (Dec. 10, 2013, 9:58 PM),
http://www.dallasnews.com/news/crime/headlines/20131210-latest-dallas-police-shooting-of-suspect-is-questioned.ece.

[13] *Id.*

27.    Smith described just how quickly the incident unfolded. Smith, who was sitting in his vehicle about 20 feet away from the maroon car, states that Walker could be seen clearly and his hands were in the air:

> His hands were in a surrender kind of pose. From there, from what I saw . . . **as soon as she opened the door, he was shot**.

28.    Smith continued by saying that "There's no reason to justify that young man getting shot, especially with him surrendering like he was."

29.    After witnessing this police shooting of an unarmed and surrendering teenager, Smith expressed that "They're [the police] supposed to protect and serve us but here we are, walking around here afraid."

30.    In fact, the horrific incident so greatly impacted Smith that he has since been scheduled to go on a police ride-along so he doesn't "have this anti-police feel with me."

31.    At the time of the incident, Plaintiff had committed no criminal offense.

**KELVION LOSES VITAL SIGNS AND REQUIRES EMERGENCY THORACTOMY**

32.    Kelvion was taken by EMS to Baylor University Medical Center. BUMC medical records are attached hereto, and incorporated by reference.[14]

33.    When he arrived, Dr. James Patrick Carroll, M.D., and other medical staff determined that "it was clear by the placement of his gunshot wound" that Kelvion was going to "need to go immediately to the operating room."[15]

34.    While physicians were preparing him for the surgery, Kelvion "lost his vital signs and did not have a pulse."[16]

35.    As Kelvion stated later, "The doctors told my family that I had to be resuscitated

---

[14] Exhibit "2," BUMC Medical Records of Kelvion Walker.
[15] *Id.* at 2.
[16] *Id.*

from death, and that I was quite lucky to have survived."[17]

36.    As a result, BUMC medical staff had to then perform an emergency thoracotomy.

37.    BUMC physicians and staff made a lateral cut into the front of his chest using a "10 blade scalpel to his chest wall and into his pleura."[18]

38.    "Immediately his pericardium was opened and his heart massaged," according to Dr. Carroll.[19]

39.    Kelvion then regained a pulse and his aorta was then clamped, the doctor further dictated in his the medical records.

40.    "At this time his aorta was very empty indicating massive hemorrhage," Dr. Carroll stated.[20]

**PLAINTIFF REGAINS HIS PULSE AND UNDERGOES ABDOMINAL SURGERY**

41.    "Once his aorta was clamped," Dr. Caroll stated, "we turned our attention to his abdomen."[21]

42.    Physicians made an abdominal incision from his xiphoid all the way down to his pubic symphysis near his groin area.  There were copious amounts of blood in the abdomen.

43.    Exploration of the abdominal area revealed that Kelvion had "multiple gunshot injuries."[22]

44.    Physicians had to literally staple Plaintiff's bowel, and have his colon repaired in multiple places.

45.    The medical staff further determined that Kelvion suffered injuries to the left

---

[17] Exhibit "1" Affidavit of Kelvion Walker at 2 ¶ 1.
[18] Exhibit "2," at 2.
[19] *Id.*
[20] *Id.*
[21] *Id.*
[22] *Id.*

internal iliac artery and the vein.  These are the arteries and the provide blood to the legs and lower half of the human body.

46.     According to Dr. Carroll, Kelvion's iliac vein was ligated proximally and distally from the injury and **"was shredded so bad that we did not think we could repair it adequately."**[23]

47.     Dr. Carroll expands in greater detail about how the procedures, and the hemorrhaging that Kelvion sustained.

48.     Kelvion's postoperative diagnoses included the following:

   a.  Gunshot wound to the abdomen
   b.  Small bowel injury
   c.  Colon injury
   d.  Left internal iliac injury
   e.  Vein injury
   f.  A left internal iliac psoas hemorrhage.[24]

49.     Because of these injuries, and associated trauma, Kelvion underwent the following procedures:

   a.  Exploratory laparotomy for trauma
   b.  Thoractomy for trauma
   c.  Open cardiac massage
   d.  Small bowel resection
   e.  Color repair
   f.  Ligation of the internal iliac vein
   g.  Suturing  of the internal iliac artery; and
   h.  Control of the sacral hemorrhage and psoas hemorrhage control.[25]

50.     On December 10th, medical staff performed a second round of procedures on Kelvion.  This second round of procedures required reopening his previous wounds, and performing further invasive procedures on bowels, colon, and iliac artery and veins.

51.     Specifically, he endured the following:

---

[23] *Id.* at 3.

[24] *Id.* at 1.

[25] *Id.*

  a. Reopening of recent laparotomy;
  b. Abdominal washout and placement of ABTherea wound vacuum-assisted closure;
  c. Small bowel resection x1;
  d. Reopening of the left thoracotomy incision with evacuation of hemothorax.[26]

52. Besides undergoing these invasive repairs of his internal organs, Kelvion received radiographic imaging that graphically displays the remains of Wilburn's 9 millimeter round which was ultimately positioned above Kelvion's right hip.

53. Following these procedures, Kelvion was placed in BUMC's Intensive Care Unit.

54. Days later, on December 13, 2013, he had to go back into surgery for a third time where doctors performed an "abdominal washout" and an abdominal closure of his wounds.[27]

55. As depicted in photographs and videotapes, Kelvion received massive external and internal scarring associated with these abdominal injuries as well as for the emergency thoracotomy.

56. Kelvion's treatment for his long-term injuries remain ongoing. Since his operations, he has continued to complain of pain to various parts of his body, including his abdominal area, torso, and appendages.

57. Post-operative radiographic findings of his lumbar spine further reveal that he has suffered a presacral heterogeneous hematoma.[28]

58. In reviewing films of post-operative MRI imaging taken of Kelvion's pelvis on January 20, 2014, Dr. Michael Lloyd determined that Kelvion still has presacral fluid from a likely hematoma and **has still has a bullet in the soft tissues of his right gluteal.**[29]

**THE DALLAS POLICE DEPARTMENT CHIEF OF POLICE DAVID O. BROWN**

---

[26] *Id.* at 4.
[27] *Id.* at 8.
[28] Exhibit "3," MRI Lumbar Spine of Kelvion Walker.
[29] Exhibit "4," MRI of Pelvis of Kelvion Walker.

### TERMINATED WILBURN FOR THE SHOOTING

59.     On January 14, 2014, DPD released a statement on its Facebook page, stating that

> All radio transmission indicated that the suspect vehicle was
> occupied by multiple individuals. **Wilburn transmitted over the
> radio that she had observed multiple suspects passing her
> location and these suspects matched the description given by
> fellow officers.**

60.     The facts of the pursuit indicate that Wilburn never lost sight of the Maroon
vehicle, and only saw one person exit when it came to a stop.

61.     DPD concluded from the circumstances that "A reasonable officer in fear for their
safety would not have approached the vehicle" in the manner that Wilburn did in this situation.

62.     On December 30, 2013, the Dallas Police Department (DPD) released a statement
regarding Officer's Wilburn termination for her actions in the shooting of Kelvion Walker.

63.     The statement detailed the incident as well as Wilburn's violation of DPD's
policies.

64.     DPD described the circumstances leading up to the shooting, stating: "While the
vehicle was moving slowly, the driver jumped out and began running and the passenger
remained inside the vehicle."

65.     "The other officers began to pursue the driver while Senior Corporal Wilburn ran
toward the vehicle with her weapon still holstered."

66.     "As Senior Corporal Wilburn opened the driver's door, she appeared surprised at
the sight of the suspect sitting in the passenger seat and almost immediately drew her weapon
and fired once, striking the suspect once in the side.".

67.     **"The Internal Affairs investigation concluded that Senior Corporal Wilburn
violated the Department's Use of Deadly Force policy when she fired upon an unarmed**

**person without fear or justification**."

68.     "This conclusion is based upon the following:

a.      "An independent witness that observed the entire shooting incident stated that the suspect, Mr. Walker, was sitting upright and had his hands up in the air the entire time, indicating surrender. The witness stated at no time did Mr. Walker lower his hands until after he was shot."

b.      "No weapon or contraband was found in the location where Senior Corporal Wilburn indicated the suspect, Mr. Walker, was hiding his hand."

c.      "At no time after the vehicle was located, did officers lose sight of the vehicle nor broadcast that any suspect had exited the vehicle until after Officer Terry reported that the driver fled from the vehicle on foot."

d.      "Senior Corporal Wilburn did not conduct a felony traffic stop to clear or challenge the vehicle, which contained possibly armed suspects."

e.      "Senior Corporal Wilburn rushed the vehicle and did not maintain distance without taking the time a reasonable officer would approaching a vehicle with armed suspects."

f.      "Senior Corporal Wilburn approached the vehicle alone after observing Officers Terry and Correa pursue the driver of the suspect vehicle."

g.      "After opening the driver's door of a still moving vehicle, Senior Corporal Wilburn observed Mr. Walker in the passenger seat and immediately drew and fired her weapon."

h.      "Senior Corporal Wilburn immediately holstered her weapon and did not stay on target as a reasonable officer would with a potentially armed and dangerous suspect."

i.    "Wilburn immediately entered the vehicle without proper cover or with her weapon at the ready under the same circumstances that a reasonable officer in fear of their life would approach an armed suspect."

j.    "As she arrived at the passenger door of the suspect, whom she believed to have a weapon, she exposed herself to the possibly armed suspect without her weapon drawn and not in a tactical manner and before the vehicle had been cleared for weapons. **A reasonable officer in fear for their safety would not have approached the vehicle in this manner.**"

k.    "Mr. Walker stated that he had his hands in the air when Senior Corporal Wilburn approached the vehicle. He stated:

    1.    he was not resisting and

    2.    he was not reaching for anything."

69.    On December 30th, Chief David Brown reiterated this point on his personal *Twitter* page.

70.    Chief Brown succinctly stated, "I have terminated SC Amy Wilburn today for firing her weapon upon an unarmed person without fear or justification."

71.    On the same date, the Department likewise posted its own *Twitter* feed that stated: "SC Amy Wilburn, #8111, was terminated for firing her weapon upon an unarmed person without fear or justification."

72.    In an article in the *Dallas Morning News* on January 15, 2014, the DPD officials once again faulted Wilburn "for failing to abide by procedures before, during and after the shooting. They [DPD officials] said she [Wilburn] shot 'without fear or justification.'"[30]

---

[30] Tristan Hallman and Tanya Eiserer, *Video Upsets Officers*, DALLAS MORNING NEWS, January 15, 2014, at 1B, 6B.

## THE INTERNAL AFFAIRS INVESTIGATION

73.     On January 14, 2014, DPD released another statement on its Facebook page, summarizing the following Internal Affairs Investigation findings:[31]

      a.  "All radio transmission indicated that the suspect vehicle was occupied by multiple individuals."

      b.  "Wilburn transmitted over the radio she had observed multiple suspects passing her location and these suspects matched the description given by fellow officers."

      c.  "At no time after the vehicle was located did officers lose sight of the vehicle, nor broadcast that any suspect had exited the vehicle until another officer reported that the driver of the vehicle fled on foot."

      d.  "The video shows Wilburn did not conduct a felony "high risk" traffic stop to clear or challenge the vehicle, which reportedly contained multiple suspects who were possibly armed."

      e.  "Wilburn is seen running to the vehicle and not maintaining distance or taking the time a reasonable officer would while approaching a vehicle with armed suspects."

      f.  "Wilburn approached the vehicle alone after two other officers began to chase the driver of the suspect vehicle on foot."

      g.  "Wilburn approached the vehicle without proper cover or with her weapon at the ready position."

      h.  "A reasonable officer in fear for their safety would not have approached a vehicle containing possible armed suspects in this manner."

---

[31] Facebbook, Statement of Dallas Police Department January 14, 2014.

Plaintiff's Second Amended Complaint

*Kelvion Walker v. Amy Wilburn*

i. **"Wilburn opened the driver's side door of the still moving vehicle, observed Mr. Kelvion Walker in the passenger seat and immediately drew and fired her weapon."**

j. "As she approached the passenger door where Mr. Walker was seated, she exposed herself to a possibly armed suspect, an action which a reasonable office in fear for their safety would not have done."

k. **"Wilburn dropped her weapon in the car before running to the passenger side."**

l. "In the video, a second officer is seen reaching into the vehicle, removing Wilburn's gun and handing it to her over the roof of the car."

m. "Wilburn then holstered her gun and failed to stay on target as a reasonable officer would have with a potentially armed and dangerous suspect."

n. "Mr. Walker stated he had his hands in the air when Wilburn approached the vehicle and was not resisting or reaching for anything."

o. "An independent witness who observed the entire incident stated Mr. Walker had his hands up in the air the entire time, indicating surrender, and did not lower his hands until he was shot."

p. "After the shooting incident, a search was made of the vehicle and no weapons or contraband were found in the location."

## OFFICER'S WILBURN VIOLATED HER DALLAS POLICE ACADEMY TRAINING

74.     Sergeant Cletus Judge, the President of the Black Police Association of Greater Dallas ("BPA"), stated that Wilburn was one of his own students in the [Dallas police]

academy.[32]

75.     He recalled that "I taught her [Wilburn] how to do a felony traffic stop."

76.     According to a public statement by the BPA, Sergeant Judge was a Defensive Tactics Instructor for nine years at the Dallas Police Academy, and has been a member of the Dallas Police Department for more than 26 years.[33]

77.     Sergeant Judge viewed the dash cam video of Wilburn's shooting of Kelvion Walker.

78.     After reviewing the video, Sergeant Judge stated that "We make mistakes, but once we do we need to own up to our mistakes and say, 'Hey I did it wrong.'"[34]

79.     He stated that "I don't think that what I saw in the video was what we taught at the police academy."

80.     He continued by saying **"I cannot speak to what the officer was 'feeling' but I do know what I saw in the video was a total disregard for the policies and procedures set in place to handle that situation."**[35]

81.     Speaking on DPD's excessive force policy and the police academy's training on the matter, Sergeant Judge stated that "I think the policy is very clear. I haven't received anything from any officers [following the Kelvion Walker incident] asking me questions like, "Hey, I'm scared, I don't know what to do."

---

[32] James Rose, *Dallas Police Unions Split on Firing of Officer Who Shot Unarmed Man*, KDFW Fox 4 (Jan. 10, 2014, 9:25 PM), http://www.myfoxdfw.com/story/24421661/dallas-police-unions-split-on-firing-of-officer-who-shot-unarmed-man.
[33] Tristan Hallman, *Black Police Association President Backs Department's Firing Decisions*, DALLAS MORNING NEWS (Jan. 19, 2014, 3:03 PM), http://crimeblog.dallasnews.com/2014/01/black-police-association-president-backs-departments-firing-decisions.html/.
[34] L. P. Phillips, *Police Union s Take Opposing Sides in Officer Involved Shooting*, CBS NEWS (Jan. 10, 2014, 1:37 PM), http://dfw.cbslocal.com/2014/01/10/police-unions-take-opposite-sides-in-officer-involved-shooting/.
[35] Tristan Hallman, *Black Police Association President Backs Department's Firing Decisions*, DALLAS MORNING NEWS (Jan. 19, 2014, 3:03 PM), http://crimeblog.dallasnews.com/2014/01/black-police-association-president-backs-departments-firing-decisions.html/.

82. Sergeant Judge spoke to police officers in similar situations and said that

> **The use of the term "I was in fear for my Life" is not a catch all phrase that will save you when bad decisions are made.** The fear that you speak about must be "Reasonable." The Deadly Force Policy is very clear. Justification for the use of deadly force must be limited to the facts reasonably apparent to the officer at the time the officer decides to use the force. When officers are involved in Deadly Force Confrontations thoughts about termination and questions about employment should not be at the forefront. I urge every officer to first, rely on your training . . .[36]

83. In conclusion, Sergeant Judge advised police officers to "recall your oath of office," stating that:

> We all vowed to defend the rights and the lives of the citizens of Dallas and our fellow officers. We acknowledged that we were willing to be held to a higher standard and to be judged on a higher standard.[37]

## DASH CAM VIDEO SHOWS THAT WILBURN USED EXCESSIVE FORCE

84. A Dash Cam video released by the DPD shows the incident starting moments before Walker's friend turned into the St. Augustine Townhomes complex.

85. The video starts at 3:09:54 p.m. on December 9, 2013.[38]

86. At 3:09:55 p.m., the vehicle Walker was a passenger of is seen turning into the St. Augustine Townhomes complex.[39]

87. At 3:10:13 p.m., the driver's side door of the vehicle Walker was occupying is opened, and the hood of the police car is seen right behind the vehicle.[40]

88. Immediately thereafter, the driver of the vehicle is seen exiting the vehicle and

---

[36] Tristan Hallman, *Black Police Association President Backs Department's Firing Decisions*, DALLAS MORNING NEWS (Jan. 19, 2014, 3:03 PM), http://crimeblog.dallasnews.com/2014/01/black-police-association-president-backs-departments-firing-decisions.html/.
[37] *Id.*
[38] (Dash Cam Video) at 00:00.
[39] *Id.* at 00:02.
[40] *Id.* at 00:22.

fleeing.[41]

89.   At 3:10:16 p.m., Wilburn is first seen entering the screen shot from the rear left side of the vehicle Walker was occupying.[42]

90.   Wilburn is seen running toward the vehicle that Walker was occupying.[43]

91.   Wilburn does not appear to be holding a weapon or any other object in her hands at this time.[44]

92.   At 3:10:16 p.m., Wilburn is seen reaching the vehicle and grabbing the driver's side door with her right hand.[45]

93.   At 3:10:18 p.m., Wilburn is seen further opening the driver's side door, and while still standing, positioning herself squarely in between the open door and the driver's seat.[46]

94.   At the same time, Wilburn is looking inside the vehicle.[47]

95.   At 3:10:19 p.m., Wilburn, after looking inside the vehicle, is seen unholstering her weapon and aiming it at the passenger's seat of the vehicle.[48]

96.   At 3:10:19 p.m., a male officer is seen entering the screen shot from the rear left side of the vehicle, running to aid Wilburn.[49]

97.   At 3:10:20 p.m., Wilburn is seen firing her weapon.[50]

98.   In her sworn statements, Wilburn categorically states that shot Kelvion *"intentionally,"* that this was not an accidental shooting.

**BEFORE TERMINATION, CHIEF BROWN HOLDS A HEARING AND DETERMINES**

---

[41] *Id.*
[42] *Id.* at 00:25.
[43] *Id.*
[44] *Id.*
[45] *Id.* at 00:26.
[46] *Id.* at 00:27.
[47] *Id.*
[48] (Dash Cam Video) at 00:28.
[49] *Id.*
[50] (Dash Cam Video) at 00:29.

**THE 'PREPONDERANCE OF THE EVIDENCE' IS AGAINST WILBURN'S ACCOUNT**

99.     Following the shooting, Defendant appeared before Chief Brown, and other DPD leaders in a disciplinary proceeding that was electronically recorded.[51]

100.    During the hearing, Chief Brown heard statements from Internal Affairs concerning the vantage point of Scottie Smith.

101.    Indeed, the IA investigators staged a re-enactment of what Smith would have seen, and determined his view was unobstructed, and his testimony credible.

102.    Wilburn urged that she thought that the vehicle was empty, despite repeated radio transmissions, including her own, indicating that there were multiple occupants.

103.    Chief Brown repudiated her statements, categorically telling her that she violated the Department's felony stop procedure, which requires officers to "challenge" the car by yelling commands or using the PA system to tell occupants—who may be hiding—to exit the vehicle and surrender, typically by getting on the ground or raising their hands in the air.

104.    Other than her claim that she thought the vehicle was empty, Wilburn had no answer for Chief Brown's question regarding why she failed to do a felony stop.

105.    "It's every time you do a felony stop," Chief Brown told her. "That would have prevented this entire incident."

106.    Wilburn further asserted her claim that she saw only Kelvion's *left* hand raised in the air.

107.    "But the preponderance of the evidence," Chief Brown said, "shows that he had both his hands up, and you shot him."[52]

108.    Chief Brown further explained that the detectives from the Crimes Against

---

[51] Audio Recording of Disciplinary Hearing,  Wilburn Bates No. 00608.
[52] *Id.* at 20:59-21:02

Persons Division and the Internal Affairs Division determined that Scottie Smith was a credible,

third party witness. He thus explained:

> Preponderance is you've got an independent witnesses that we believe are credible that sees both hands up when you shoot. And CAPERS and IAD believe that this guy doesn't have a bone to pick with the Department—doesn't dislike police, has no reason to lie, and he is within 20 feet away, and credibly he sees the whole thing unobstructed.[53]

109.    Chief Brown emphatically stated that the great weight of credible evidence was

against Wilburn.

> Despite what you say, the preponderance is against what you say.   The preponderance is that his hands were up, and it is a violation of our deadly force policy to shoot suspects who surrender to us with their hands up, which leaves me no choice, but to terminate your employment from the Dallas Police Department.[54]

## GRAND JURY INDICTS WILBURN FOR
## AGGRAVATED ASSAULT BY A PUBLIC SERVANT

110.    Following her termination from the Dallas Police Department, the investigation

was handed over to the Dallas County District Attorneys' Office which presented the matter to a

grand jury.

111.    On April 24, 2014, the grand jury returned a true bill of indictment that charged

her with committing against Plaintiff the First Degree Felony offense of Aggravated Assaulted

by a Public Servant, an offense under Section 22.02(b)(2)(A) of the Texas Penal Code.

112.    Media accounts indicated that Wilburn is the first such officer in more than four

decades to be so charged.

---

[53] 21:03-21:30
[54] 21:31-21:50

## DEPOSITIONS OF DPD CHIEFS SHOW WILBURN WAS "RECKLESS"

### A. CHIEF BROWN

113.    During an all-day deposition on November 19, 2014, Chief Brown testified that Wilburn "rushed" the Chevy Malibu with "reckless abandon."

114.    A former SWAT supervisor who participated and supervised the execution of more than a 1,000 high risk felony warrants without firing a shot, Brown further testified that Wilburn made a "series" of "tactical errors" that related to her not performing a proper felony stop.

115.    The chief, who has also conducted more than 700 felony stops, also expressed concern that Wilburn somehow drop her service pistol, which landed on the front seat of the vehicle.

116.    Under cross-examination by Wilburn's attorney, he declared "anarchy" would result, if officers were allowed to shoot unarmed individuals.

### B. ASSISTANT CHIEF LAWERENCE

117.    Assistant Chief Lawrence had recommended that Wilburn be terminated for this incident.

118.    Chief Lawrence is a highly decorated member of officer who has been with the Department since 1985 when he was named "Rookie of the Year." Graduating first in his class at the police academy, Chief Lawrence has a long, distinguished career that included supervisory positions over SWAT, Homeland Security, the police academy, several patrol divisions.

119.    Throughout his deposition, Chief Lawrence testified that Wilburn was not justified in shooting Plaintiff. Indeed, he stated that what she did bordered on reckless.

120.    When asked to explain how she was reckless, he elaborated:

> I really believe leading up to the event, she violated so many of our rules and procedures that exposed herself to an unnecessary situation. I believe at the point the shooting occurred, she just—I just don't believe she was justified – I don't believe there was reasonable belief that she had….[55]

121.    Chief Lawrence emphasized that he viewed Wilburn's conduct in the totality—not just at the moment when she shot the unarmed Plaintiff.

> I think the issue of her –the reckless part of it characterizes the context of the whole event, not just the one shooting. The jumping out, running up there, immediately engaging, not doing the things thatwe teach them to do, not taking any kind of safety precautions, that's—taken as a whole….[56]

### C. DEPUTY CHIEF PEREZ

122.    Deputy Chief Gloria Perez supervised the Internal Affairs Division during the investigation of Defendant.

123.    Before her recent retirement, Chief Perez had a long career with Department, which began in 1983. Like Lawrence, she was promoted through the ranks, rising to Deputy Chief where she had supervised multiple departments, including Internal Affairs.

124.    Chief Perez emphasized that the Department trains officers not to rush into uncertain circumstances and indiscriminately resort to deadly force. She explained:

> We are taught, you know, not to rush into the vehicle, maintain a distance, and that's what that's talking about. In other words, could there have been a way for the officer to pull away and try to avoid that deadly force or any deadly force confrontation.[57]

125.    Like Chief Lawrence, Chief Perez thus testified that Defendant committed multiple acts of recklessness, including rushing the vehicle, losing control of her firearm, and not "staying on target."

126.    The Internal Affairs supervisor further testified repeatedly that she could not think

---

[55] Exhibit 7, Deposition of Thomas Lawrence, at 241:23-242:5

[56] *Id.*, at 242:11-16.

[57] Exhibit 8, Deposition of Gloria Perez, at 79:23-80:2

of one instance where it would be reasonable to shoot an unarmed man with his hands raised in the air.[58]

## DPD DELAYED IA INVESTIGATION TO WILBURN'S BENEFIT

127.    In the litigation and elsewhere, Wilburn's proponents have criticized the Internal Affairs investigations as rushed judgments against her.

128.    Chief Brown testified completely to the contrary.

129.    He stated that at his direction the Department delayed the IA investigation to determine three things: (1) the presence of a handgun in or near the Malibu; (2) the strength and credibility of the testimony of Scottie Smith; and (3) whether Walker could be tied to the robbery.

130.    The chief emphasized under oath that he repeatedly inquired about whether the detectives could find a gun near Kelvion.

131.    The answer never changed:  there was no gun.  Quite the contrary, even after Wilburn dropped her gun in the seat next to Walker after wrongfully shooting him, the wounded teen made no effort to seize the service weapon.

132.    The evidence from Scottie Smith, the chief further stated, could not be rationalized in Wilburns' favor either.

133.    He stated that investigators looked to see if he had a criminal history, or a bias against the police.  Emphasizing that Smith did not "waver" in his statements, he stated that the

---

[58] *Id.*, at 231:20-232:2; 233:14-18.

Notre Dame graduate had no criminal history, and had actually been in the "ride-along" program with the police.

### DPD FOUND NO EVIDENCE OF WALKER'S GUILT FOR CAR JACKINGS

134.    Both of these questions being answered against Wilburn, the chief and the Department still held out the possibility that a breakthrough in the car jacking case might aid Wilburn. That did not happen either.

135.    DPD interviewed several witnesses and purported co-conspirators, hoping that one of the latter group would "flip" and incriminate Kelvion.

136.    Chief Brown candidly testified that the Department came up with *no evidence* of Walker's participation in the car jackings.

137.    He further confirmed that neither the complainant of the Malibu carjacking, Jeremy Leatch, *and* the manager of the Diamond Shamrock who had surveillance video of the suspects **did not** identify Kelvion in a photographic lineup.

138.    The chief further testified that based on the Department's investigation that there was *not even probable cause* to charge Plaintiff for any of the car jackings, or even possession of a stolen cell phone.

### FACTS SHOW THAT WILBURN USED EXCESSIVE FORCE

139.    At all times relevant to his encounter with Defendant, Plaintiff was unarmed.

140.    At all times relevant to his encounter with Defendant, Plaintiff did not resist arrest.

141.    At all times relevant to his encounter with Defendant, Plaintiff had surrendered.

142.    At all times relevant to his encounter with Defendant, Plaintiff had raised his

hands in the air.

143.   At all times relevant to his encounter with Defendant, Plaintiff did not evade arrest.

144.   The Dallas Police Department did not recover any weapons in the vehicle stopped in this action.

145.   The Dallas Police Department did not recover any weapons from Plaintiff.

146.   Plaintiff had not employed any force against Defendant.

147.   Plaintiff suffered injuries from a 9 millimeter automatic pistol.

148.   Defendant employed deadly force against Plaintiff.

149.   Defendant was acting under color of law when she used force against Plaintiff.

150.   Defendant knew that Plaintiff was unarmed and not resisting because he had his hands in the air.

151.   Defendant knew that Plaintiff was surrendering because he had his hands in the air.

152.   Defendant manifested conscious indifference firing at Plaintiff when he had his hands in the air.

153.   Discharging a firearm at an individual is a show of deadly force.

154.   The use of deadly force in this instance was unreasonable.

155.   Defendant knew or should have known that the use of deadly force in this instance was unreasonable.

156.   Defendant violated Plaintiff's Fourth Amendment rights.

## NO REASONABLE OFFICER COULD POSSIBLY BELIEVE THAT DEFENDANT'S USE OF FORCE WAS JUSTIFIABLE

157.    Wilburn's actions of shooting Plaintiff Walker were deliberate, malicious, and exercised with a wanton/reckless disregard for the Plaintiff's constitutional rights.

158.    Fourth Amendment jurisprudence has clearly established that police officer cannot use deadly force upon an unarmed suspect who is not showing signs of active resistance.

159.    The force utilized by Wilburn was excessive and, thus, constituted an unreasonable seizure of Plaintiff in violation of the Fourth and Fourteenth Amendments to the United States Constitution.

160.    Wilburn's actions constituted an unlawful deprivation of Plaintiff's liberty without due process of law in violation of the Fourteenth Amendment to the United States Constitution.

## USE OF DEADLY FORCE ON AN UNARMED PERSON IS A CLEARLY ESTABLISHED CONSTIUTITONAL VIOLATION

161.    In *Tennessee v. Garner*, the Supreme court held that "The use of deadly force to prevent the escape of all felony suspects, *whatever the circumstances*, is constitutionally unreasonable."[59]

162.    The Court emphasized that "[T]he fact that [Plaintiff] was a suspected burglary could not, without regard to other circumstances, automatically justify the use of deadly force.[60]

163.    The Fifth Circuit has repeatedly relied on *Tennessee v. Garner* in holding that the use of deadly force on an unarmed individual is a clearly established violation of the individual's Fourth Amendment rights.[61]

---

[59] *Tennessee v. Garner*, 471 U.S. 1, 12 (1985) (emphasis added).

[60] *Tennessee v. Garner*, 471 U.S. at 21.

[61]*Sanchez v. Fraley*, 376 Fed. Appx. 449, 453 (5th Cir. 2010) (unpublished); *Hobart v. City of Stafford*, Not Reported in F.Supp.2d 2010 WL 3894112 (5th Cir. 2010) (unpublished); [61] *Echols v. Gardiner*, No. H-11-0882,

164. In *Sanchez v. Fraley*, where a police officer shot a fleeing suspect in a double homicide after hearing on the police radio that the suspect had a gun and had forcibly attempted to enter somebody's house, the Fifth Circuit looked to *Tennessee v. Garner* once again, and stated that

> [I]t was clearly established well before that date [August 23, 2007] that "deadly force violates the Fourth Amendment *unless* 'the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others.'"[62]

165. In *Sanchez v. Fraley*, the police officer had further testified that the suspect was digging in his waistband and pointing his hands under his shirt, as though aiming a weapon.[63]

166. In *Davis v. Montgomery*, The United States District Court for the Southern District of Texas (Houston Division), also relied in *Tennessee v. Garner* in stating:

> The Supreme Court has held that "it is unreasonable for an officer to "seize an unarmed, nondangerous suspect by shooting him dead."
> [T]he principle stated above, that 'a police officer may not seize an unarmed, nondangerous suspect by shooting him dead" has long been clearly established.
> Fifth Circuit law is clear that "an exercise of force that is reasonable at one moment can become unreasonable in the next if the justification for the use of force has ceased.[64]

167. The Houston Court continued to rely on *Garner* in *Hobart v. City of Stafford*, in making decision regarding qualified immunity, and stated that

> In 2009, when [Plaintiff's] shooting death occurred, it was clearly established that " 'deadly force violates the Fourth Amendment unless the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to

---

2013 WL 6243736, slip op. (S.D. Tex. 2013) (unpublished); *Davis v. Montgomery Cnty.*, ___ F.Supp.2d ___, No. H:07-505, 2009 WL 1226904 (S.D. Tex. 2009) (unpublished).

[62] *Sanchez v. Fraley*, 376 Fed. Appx. 449, 453 (5th Cir. 2010) (unpublished) (emphasis in original).

[63] *Sanchez v. Fraley*, 379 Fed. Appx. 449 at 452.

[64] *Davis v. Montgomery Cnty.*, ___ F.Supp.2d ___, No. H:07-505, 2009 WL 1226904 at *4-5 (S.D. Tex. 2009) (unpublished).

others.'"[65]

168.    More recently, the Southern District Court once again relied on the above principle in *Echols v. Gardiner*, holding that

> [Plaintiff] was unarmed at the time and posed no threat to [the officer]. Under this version of the facts, it was clearly established at the time of the incident that [the officer's] shooting violated the Fourth Amendment.[66]

169.    In *Echols v. Gardiner*, a courtesy officer was involved in a domestic disturbance situation at an apartment complex, and was confronted with a noncompliant Plaintiff who refused the officer's to get on the ground and attempted to flee the situation by getting away from the officer's grasp and heading for his car.[67]

## PLAINTIFF SUFFERS SEVERE LONG-TERM INJURIES

### A. ORTHOPEDIC IMPAIRMENT

170.    Besides almost dying and undergoing three surgeries at Baylor Hospital, Plaintiff has endured severe, permanent injuries.

171.    Orthopedist Dr. Huntly Chapman determined that Kelvion's left thigh was eight centimeters less in circumference than his right.  He cited the *Guides to the Evaluation of Permanent Impairment,* American Medical Association Fourth Edition which he said indicates that "impairments from leg muscle atrophy" with *three* centimeters of difference in circumference is *severe.*

172.    He further diagnosed Kelvion with "peripheral nerve impairment of the sensory femoral nerve."

173.    Based on these impairments, Dr. Chapman concluded that Kelvion had a 9%

---

[65] *Hobart v. City of Stafford,* ___ F.Supp.2d ___,  No. 4:09-cv-3332, 2010 WL 3894112 at *8 (S.D. Tex. 2010) (unpublished).
[66] *Echols v. Gardiner,* No. H-11-0882, 2013 WL 6243736, slip op. at *18 (S.D. Tex. 2013) (unpublished).
[67] *Echols v. Gardiner,* 2013 WL 6243736 at *2.

whole person impairment, but he noted that this impairment rating *excluded* sexual functioning.

174.   "This does not include the sexual dysfunction," Dr. Chapman stated, "which would require an urologist to render an opinion.  Should an urologist render an opinion, I would be happy to combine that value with the 9% for the wasted dysesthethetic leg."

## B.  UROLOGICAL IMPAIRMENT

175.   Dr. Paul Turek determined that Kelvion suffered a residual left femoral neuropraxia after the shooting that precludes him from ejaculating.  The Standford-educated urologist explained the cause of the injury:

> This is likely due to neurologic impairment, and most probably involves the afferent pelvic nerves in the pelvis.  Presumably, since this event has occurred after the December injury it is related to nerve damage from the bullet, the blast path or the bleeding and surgical manipulation required to treat him.

176.   Dr. Turek outlined a complex treatment plan that included the prescription of testosterone, surgical sperm retrieval techniques, and the use of rectal probe electrojaculation to harvest sperm.

177.   At the time of this amended pleading, Kelvion's urological impairment had not been submitted to Dr. Chapman.

## C.  NEUROLOGICAL AND PSYCHOLOGICAL IMPAIRMENT

178.   The trauma of this near death experience cannot be overstated.

179.   More than one of Kelvion's physicians noted that Kelvion suffered the following mental injuries:

        a.  Depression
        b.  Nervousness
        c.  Personality change
        d.  Post-Traumatic Stress
        e.  Impotence
        f.  Numbness and tingling

      g.  Sleeplessness

      h.  Visual changes

180.    Kelvion continues to receive medical treatment, and will require life time medical monitoring of all of his different conditions—some which may require subsequent surgical interventions.

## WILBURN'S PAST EXPERIENCE WITH JUDGMENT ERRORS

181.    Wilburn was involved in another Dallas Police Department controversy last year, where officers responded to a domestic violence call about 50 minutes after the victim, Deanna Cook, had called 911.

182.    In that case, the officer's delayed response resulted in the victim's death by being drowned in her own bath tub.

183.    A copy of the Second Amended Complaint brought by the victim's family chronicles the series of missteps that resulted in the officer's inappropriate and slow response:

> Officers Julie Menchaca and Amy Wilburn, who were in the field, originally volunteered to check into Deanna Cook's call. While supposedly *en route* to Ms. Cook's residence, Officers Menchaca and Wilburn stopped to investigate a residential burglary alarm call on Earnhardt Way that was a false alarm.
> Also, while *en route* to Ms. Cook's residence, Officers Menchaca and Wilburn stopped at a 7-11 convenience store to make a personal purchase.
> Prior to arriving at Ms. Cook's residence, Officers Menchaca and Wilburn also took time out to complete disposition comments for a previous call that had been resolved.
> Prior to arriving at Ms. Cook's residence, Officers Menchaca and Wilburn were made aware that Ms. Cook was screaming for help and that a scuffle could be heard in the background of her 9-1-1 call.

184.    In addition to the officer's late response to a domestic violence 911 call, the officers also failed to investigate the matter upon arriving at the victim's house:

> Officers Menchaca and Wilburn simply knocked on the door and

had someone call Ms. Cook's cellular phone. Not surprisingly, the call went to voicemail. [S]hortly after they arrived, Officers Menchaca and Wilburn left, without performing any additional investigation of Ms. Cook's whereabouts, her residence, or her 9-1-1 call.

185.    In their Answer to an Amended Complaint in that case, Officers Wilburn and Menchaca admitted to the following allegations in the Cook family's Second Amended Complaint:

a. Officers Julia Menchaca and Amy Wilburn, who were in the field, originally volunteered to check into Deanna Cook's call;

b. Prior to arriving at Ms. Cook's residence, Officers Menchaca and Wilburn were made aware that Ms. Cook was screaming for help and that a scuffle could be heard in the background of her 9-1-1 call;

c. Nearly 50 minutes after Deanna Cook's 11-minute 9-1-1 call was placed, Officers Menchaca and Wilburn finally arrived at Ms. Cook's southeast Dallas house.

d. While at Ms. Cook's residence, Officers Menchaca and Wilburn did not go around to the rear of Ms. Cook's residence, did not peek through all of Ms. Cook's windows, . . . and never attempted to forcibly gain entry into the home.

## CAUSES OF ACTION

## VIOLATION OF CONSTITUTIONAL RIGHTS

186.    The factual allegations contained in all of the paragraphs of this Second Amended Complaint are hereby incorporated and re-alleged for all purposes and incorporated herein with the same force and effect as if set forth verbatim.

187.   Wilburn intentionally, knowingly, and recklessly shot Kelvion Walker with her

firearm, despite having no legitimate reasons for doing so.

188.   The force used by Defendant was recklessly excessive and caused Plaintiff

serious bodily injury.

189.   Defendant Wilburn's exercise of established policies and customs violated

Plaintiffs' clearly established rights under the United States Constitution to:

    a.   freedom from unreasonable seizure;

        i.   by shooting Plaintiff who was unarmed;
        ii.   by shooting Plaintiff who was not resisting;
        iii.   by shooting Plaintiff who was surrendering;
        iv.   by shooting Plaintiff who had his hands raised in the air;
        v.   by shooting Plaintiff who had committed no criminal offense;
        vi.   by shooting Plaintiff who had not evaded arrest; and
        vii.   by shooting Plaintiff who had surrendered to a show of lawful authority.

    b.   freedom from the use of unreasonable, unnecessary, and excessive force;

        i.   by shooting Plaintiff who was unarmed;
        ii.   by shooting Plaintiff who was not resisting;
        iii.   by shooting Plaintiff who was surrendering;
        iv.   by shooting Plaintiff who had his hands raised in the air;
        v.   by shooting Plaintiff who had committed no criminal offense;
        vi.   by shooting Plaintiff who had not evaded arrest; and
        vii.   by shooting Plaintiff who had surrendered to a show of lawful authority.

    c.   and the right to medical care for injuries received while in custody;

        i.   by not calling 911 or emergency medical services after shooting Plaintiff;
        ii.   by delaying contacting EMS after shooting Plaintiff; and
        iii.   by handcuffing Plaintiff after he had been shot.

190.   Alternatively, Defendant Wilburn violated established policies and customs of the

Dallas Police Department, and likewise violated Plaintiffs' clearly established rights under the

United States Constitution to:

    d.  freedom from unreasonable seizure;

        i.  by shooting Plaintiff who was unarmed;

       ii.  by shooting Plaintiff who was not resisting;

     iii.  by shooting Plaintiff who had committed no criminal offense;

     iv.  by shooting Plaintiff who had not evaded arrest;

      v.  by shooting Plaintiff who had surrendered to a show of lawful authority.

    e.  freedom from the use of unreasonable, unnecessary, and excessive force;

        i.  by shooting Plaintiff who was unarmed;

       ii.  by shooting Plaintiff who was not resisting;

     iii.  by shooting Plaintiff who had committed no criminal offense;

     iv.  by shooting Plaintiff who had not evaded arrest;

      v.  by shooting Plaintiff who had surrendered to a show of lawful authority.

    f.  and the right to medical care for injuries received while in custody;

        i.  by not calling 911 or emergency medical services after shooting Plaintiff;

       ii.  by delaying contacting EMS after shooting Plaintiff; and

     iii.  by handcuffing Plaintiff after he had been shot.

## DAMAGES

191.    As stated above, Plaintiff sustained severe traumatic injuries, as a direct result of the actions and/or omissions of the Defendant described hereinabove.

192.    Plaintiff's long-term medical conditions presently remain unknown, but he continues to seek treatment for his severe, painful and disfiguring injuries.

193.    Plaintiff requests the following relief:

    a.  All reasonable and necessary attorneys' fees incurred by or on behalf of Plaintiff;

    b.  All reasonable and necessary costs incurred in pursuit of this suit;

    c.  Inconvenience;

    d.  $1,000,000 (one million dollars) for mental anguish in the past;

    e.  $500,000 (five hundred thousand dollars) for mental anguish in the future;

    f.  $500,000 (five hundred thousand dollars) for disfigurement in the past;

    g.  $500,000 (five hundred thousand dollars) Disfigurement in the future;

    h.  More than $203,000 (two hundred three thousand dollars) in reasonable

medical care and expenses in the past.

i.   These expenses were incurred by Plaintiff and such charges are reasonable and were usual and customary charges for such services in Dallas County, Texas;

j.   More than $45,000 (forty-five thousand dollars) in reasonable and necessary medical care and expenses which will in all reasonable probability be incurred in the future;

k.   Loss of earnings in the past;

l.   Loss of earning capacity which will, in all probability, be incurred in the future;

m.  $1,500,000 (one million five hundred thousand dollars) in physical pain and suffering in the past;

n.  $750,000    (seven hundred fifty thousand dollars) in physical pain and suffering in the future;

o.   $1,500,000 (one million five hundred thousand) in physical impairment in the past; and

p.   $2,000,000 (two million five hundred thousand dollars) in physical impairment which, in all reasonable probability, will be suffered in the future.

194.   Thus, at present, Kelvion Walker seeks some $8,498,000 in actual damages for his near death, grisly disfigurement, and permanent debilitating, and humiliating injuries.

## EXEMPLARY DAMAGES

195.   Plaintiff expressly incorporates and reallages the facts and statements previously made.

196.   Plaintiff would further show that the acts and omissions of Wilburn complained of herein were committed with intentionally and/or with reckless indifference to the protected rights of the Plaintiff.

197.   The Dallas Police Department has already established that Wilburn violated the Department's use of force policy in multiple ways.

198.   Three separate chiefs of the Department have stated that Wilburn acted recklessly, or with "reckless abandon."

199.   Wilburn gave a sworn statement that she shot Plaintiff intentionally.

200.   The Dallas Police Department has already determined by a preponderance of the

evidence that Wilburn shot Walker without justification.

201.    Wilburn's own use of force instructor has concluded that she acted unreasonably.

202.    Wilburn dropped her gun in the vehicle, showing no control of a *per se* deadly weapon.

203.    Wilburn's shooting of Kelvion Walker is not the only incident in her career where she has shown fatal misjudgment.

204.    The law is absolutely clear that deadly force is not to be employed simply because a felon is fleeing.  In the present instance, Plaintiff did not flee, but had his hands raised in the air.

205.    The Department further determined that Wilburn had no fear at the time of the shooting.

206.    As a result of this incident, a Dallas County grand jury has indicted Wilburn for the First Degree Felony offense of Aggravated Assaulted by a Public Servant, an offense under Section 22.02(b)(2)(A) of the Texas Penal Code.

207.    In order to punish said Defendant for engaging in unlawful vicious attacks, and to deter such actions and/or omissions in the future, Plaintiff also seeks recovery of exemplary damage of not less than $2 million, but not greater than $17 million.

## ATTORNEYS' FEES

208.    Plaintiff is further entitled to receive his reasonable attorneys' fees pursuant to 42 U.S.C. § 1988.

## JURY DEMAND

209.    Plaintiff respectfully demands that this action be tried before a jury.

## CONCLUSION

210.    In conclusion, Plaintiff, KELVION WLAKER, respectfully urges that the Defendant be cited to appear and answer herein, and that upon a final hearing of the cause, judgment be entered for the Plaintiff against the Defendant for damages in an amount within the jurisdictional limits of the Court; exemplary damages, attorneys' fees; together with pre- and post-judgment interest as allowed by law; costs of court; and such other further relief to which the Plaintiff may be entitled at law or in equity.

Respectfully submitted,

By:    /s/ Geoff J. Henley
Geoff J. Henley
Texas Bar No. 00798253
ghenley@henleylawpc.com
R. Lane Addison
Texas Bar No. 00798253
rladdison@henleylawpc.com

**HENLEY & HENLEY, P.C.**
3300 Oak Lawn Avenue, Suite 700
Dallas, Texas  75219
Tel. (214) 821-0222
Fax. (214) 821-0124

**ATTORNEYS FOR PLAINTIFF
KELVION WALKER**

## CERTIFICATE OF SERVICE

I hereby certify that on November 26, 2014, I electronically submitted the foregoing document with the clerk of the court for the U.S. District Court, Northern District of Texas, using the CM/EFC system which will send notification to all attorneys of record who are registered for electronic notice.

/s/ Geoff J. Henley

Geoff J. Henley

### AFFIDAVIT OF KELVION WALKER

Came before me, the undersigned authority, the following who swore an oath, and said the following:

"My name is Kelvion Walker. I am above the age of 18, and am a student at Spruce High School. My date of birth is August 15, 1994. I am of sound mind and have never been convicted of a felony, and I am, in all respects , competent to provide sworn testimony. Pursuant to 28 U.S.C. Section 1746, I declare under penalty of perjury that all of the matters stated herein are within my personal knowledge.

On December 9, 2013 during the afternoon, Dallas Police Officer Amy Wilburn shot me while I was unarmed and had both of my hands in the air.

Only a couple of minutes before, I had gotten into a car with my friend, Reginald "Reggie" Robertson. No one else was with him. It was just the two of us in the car. I had not known that the car had been stolen in an armed robbery.

We drove a minute or so, and then passed some marked police units near the intersection of St. Augustine and Military Parkway. The police did a "U-turn" and got right behind us, and Reggie said the police were following us. They turned on their lights but not their sirens. I told him to stop because he looked like he wasn't going to stop.

They followed us and Reggie turned onto a street inside the area where the St. Augustine Townhomes are. Reggie then jumped out the car and ran, and the car hit the curb. I remember putting my hands up.

While I had both of my hands in the air, I could see the woman officer—whom I later learned was Officer Amy Wilburn—walking up to the car. I remember her walking past the car, and I had my hands up. Then, she looked at me through the open car door, and I looked at her and she just shot.

I had both of my hands in the air the whole time. They were empty, and I did not see any weapons in the vehicle, and was not about to reach for anything or do anything to resist.

I just remember yelling to her, "What you shoot me for?"

She came around to my side of the vehicle, and she said something like, "I'm sorry, I'm sorry, I apologize. I didn't try to."

Before she shot me, she had not said anything, like "freeze," or "put your hands in the air." She had not said anything at all. She just looked at me, and I looked at her, and then she shot. It had happened in a few seconds or less.

Affidavit of Kelvion Walker   ___ Initials
1 | P a g e


EXHIBIT

1

After the shooting, it seemed like there was a delay before I was taking to the hospital, but I had lost consciousness at some point. I was in the I.C.U. at Baylor for several days, and had to have three surgeries on my chest, stomach and small intestines. The photographs that are attached, and marked as Exhibits 1, 2, and 3 are of me while I was in the hospital after the surgeries. The photographs fairly and accurately depict the scars related to my injuries. The doctors told my family that I had to be resuscitated from death, and that I was quite lucky to have survived.

I cannot believe Officer Wilburn did this. I have since heard that supposedly she and the other police officers were investigating some kind of auto theft ring, and that Reggie and two juveniles had been charged, but I do not see how any of that would allow her to shoot me while I had my hands in the air, and had surrendered. I had every intention of cooperating with her. She just looked at me inside the car, and shot."

AFFIANT SAID NOTHING FURTHER.

_Kelvion Walker_
KELVION WALKER

Signed and sworn before me, the undersigned notary on this the 26TH day of December, 2013.

_Burlie Elizabeth Hanson_
Notary Public, State of Texas

BURLIE ELIZABETH HANSON
Notary Public, State of Texas
My Commission Expires
January 19, 2016

Affidavit of Kelvion Walker _KW_ Initials
2 | P a g e

PATIENT NAME: WALKER, KELVION LEON
MRN / ACCOUNT #: 433045 / 61124433
DOB / AGE / SEX: 08/15/1994 / 19Y / M

ADMIT DATE: 12/09/2013
DICTATION DATE/TIME: 01/04/2014 02:50 PM
PROVIDER: WEDDLE, REBECCA J. (R)

DATE OF SURGERY:
12/09/2013

PREOPERATIVE DIAGNOSIS:
Gunshot wound to the abdomen.

POSTOPERATIVE DIAGNOSES:
1. Gunshot wound to the abdomen.
2. Small bowel injury.
3. Colon injury.
4. Left internal iliac injury.
5. Vein injury.
6. A left internal iliac psoas hemorrhage.

PROCEDURES PERFORMED:
1. Exploratory laparotomy for trauma.
2. Thoracotomy for trauma.
3. Open cardiac massage.
4. Small bowel resection.
5. Colon repair.
6. Ligation of internal iliac vein.
7. Suturing of internal iliac artery.
8. Control of sacral hemorrhage and psoas hemorrhage control.

SURGEON:
James Carroll, M.D..
Brandon Rabeler, M.D.

RESIDENT:
Dr. Rebecca Weddle,

ANESTHESIA PROVIDER:
Dr. Muro, (R) MD

ANESTHESIA:
General endotracheal anesthesia.

COMPLICATIONS:
None.

ESTIMATED BLOOD LOSS:
3000 mL

WALKER, KELVION LEON
Enterprise Patient ID: 929725
Medical Record #: 433045 / Account #: 61124433
Operative Report

TRANSCRIPTION DATE/TIME: 1/4/2014 3:50 PM

Page 1 of 3

EXHIBIT
2

PATIENT NAME: WALKER, KELVION LEON                    ADMIT DATE: 12/09/2013
MRN / ACCOUNT #: 433045 / 61124433              DICTATION DATE/TIME: 01/04/2014 02:50 PM
DOB / AGE / SEX: 08/15/1994 / 19Y / M                 PROVIDER: WEDDLE, REBECCA J. (R)

TISSUE REMOVED:
Small bowel.

IMPLANTS:
None

DRAIN:
ABThera wound VAC is the drain.
Also two left-sided chest tubes were placed for drainage.

DESCRIPTION OF PROCEDURE:
The patient is a 19-year-old male who was shot by the police on 12/09/2013. He
was brought into the BUMC emergency room. At the time he was brought in it was
clear by the placement of his gunshot wound, that he was going to need to go
immediately to the operating room. He was also moderately hypotensive in the
trauma bay and therefore taken emergently to the operating room. In the
operating room he was prepped and draped in the usual sterile fashion. In the
process of prepping and draping him he lost his vital signs and did not have a
pulse. At this time, an emergency thoracotomy was started. An anterolateral
cut was made in his chest. This was taken down using just a 10 blade scalpel
to his chest wall and into his pleura. Upon entering the chest there was some
minimal blood that was released. Immediately his pericardium was opened and
his heart massaged. He regained a pulse and his aorta was then clamp. Blunt
dissection was used to get around his aorta in his chest. Aortic clamp was
placed. At this time his aorta was very empty indicating massive hemorrhage.
Once his aorta was clamped, we turned our attention to his abdomen. We made an
abdominal incision from the xiphoid down to the pubic symphysis. This was
opened using electrocautery, down to the level of the fascia. The fascia was
opened widely. There was copious amounts of blood in the abdomen and all 4
quadrants were packed off. There was also very large retroperitoneal hematoma.
At this time we allowed anesthesia to catch up with transfusion, which they
were able to do. Once he started being a little bit more stable we started
removing packs and exploring the abdomen.

Upon running the small bowel it was noted that he had multiple gunshot wound
injuries, and a piece of small bowel was resected and put back together using
GIA 75 staplers. Following this mesenteric defect was closed using 3-0 silk.
Moving onward we ran the colon in its entirety. There was a hole in the
descending colon close to the sigmoid area. A 2 layered closure was completed
here using 3-0 Vicryl followed by a layer of 3-0 silk. The colon was then
mobilized medially as there was a large  retroperitoneal hematoma identified.
Once we did the left side _____ visceral rotation we could see there was
copious bleeding at the level of the iliacs. Upon further dissection this was
the left internal iliac artery and vein where he had 2 injuries. Control of

WALKER, KELVION LEON
Enterprise Patient ID: 928725
Medical Record #: 433045 / Account #: 61124433
Operative Report

Page 2 of 3

TRANSCRIPTION DATE/TIME: 1/4/2014 3:50 PM

2

PATIENT NAME: WALKER, KELVION LEON
MRN / ACCOUNT #: 433045 / 61124433
DOB / AGE / SEX: 08/15/1994 / 19Y / M

ADMIT DATE: 12/09/2013
DICTATION DATE/TIME: 01/04/2014 02:50 PM
PROVIDER: WEDDLE, REBECCA J. (R)

these was quickly gained, and the iliac vein was ligated both proximally and distally to the area of injury. This was shredded so bad that we did not think we could repair it adequately. The internal iliac artery also had a defect which was sewn closed using 4-0 Prolene. Once this was controlled attention was turned over to the psoas where there was quite a bit of hemorrhage as well. The psoas as well as towards the sacral area near the iliac artery and vein were still having quite a bit of bleeding. This was packed off tightly. Multiple sheets of Surgicel as well as Arista were used to pack off this area. Control was gained with packing. At this time the patient had been in the operating room and fairly hypotensive for some period of time and the thought was that we had now gained control of all of his bowel injuries and control of his vascular injuries, and that we should take him to the intensive care unit for resuscitation and bring him back to the operating room at another time. With this being said, an ABThera VAC was placed on the abdominal wound. In the left chest two left-sided chest tubes were placed, one anterior and one posterior. This was whipstitch closed using silk suture. He was quite oozy during this process as he was cold and coagulopathic at this time. Once the chest was closed and the abdomen was closed with the ABThera, he was taken up to the intensive care unit for further resuscitation. Dr. Carroll and Dr. Rabeler were present during all portions of the procedure and all the instrument and sponge counts at the end of the procedure were correct. The plan will be for him to return to the operating room once he is warmed and resuscitated.

Dictated by: REBECCA J. (R) WEDDLE, MD

Unreviewed

_____
James Patrick Carroll, M.D.

WE/nts/JL#55969/CSDoc#932781254
D: 01/04/2014 02:50 P     T: 01/04/2014 03:50 P      Work Type Entered:

WALKER, KELVION LEON
Enterprise Patient ID: 929725
Medical Record #: 433045 / Account #: 61124433
Operative Report

Page 3 of 3

TRANSCRIPTION DATE/TIME: 1/4/2014 3:50 PM

3

PATIENT NAME: XYZWALKER, KELVION LEON
MRN / ACCOUNT #: 433045 / 61124433
DOB / AGE / SEX: 08/15/1994 / 19Y / M

ADMIT DATE: 12/09/2013
DICTATION DATE/TIME: 12/11/2013 02:40 AM
PROVIDER: HAMILTON, EMMA C. (R)

DATE OF OPERATION:
12/10/2013

PREOPERATIVE DIAGNOSES:
1. Open abdomen, gunshot wound to the abdomen with small bowel injury, colon
injury, left internal iliac artery and vein injury, sacral and psoas
hemorrhages.
2. Left hemothorax.

POSTOPERATIVE DIAGNOSIS:
1. Open abdomen, gunshot wound to the abdomen with small bowel injury, colon
injury, left internal iliac artery and vein injury, sacral and psoas
hemorrhages.
2. Left hemothorax.

PROCEDURES:
1. Reopening of recent laparotomy.
2. Abdominal washout and placement of ABThera wound vacuum-assisted closure.
3. Small bowel resection x1.
4. Reopening of left thoracotomy incision with evacuation of hemothorax.

ATTENDING STAFF:
James P. Carroll, MD

RESIDENTS:
1. Emma Hamilton, MD
2. Stephanie Joyce, MD

ANESTHESIA:
General endotracheal anesthesia.

ESTIMATED BLOOD LOSS:
Approximately 300 mL of clotted blood was removed from the patient's left
chest. Minimal new blood loss.

TISSUES REMOVED:
Small bowel.

DRAINS:
1. ABThera wound VAC.
2. Two 36-French left-sided chest tubes.

FINDINGS:
The patient with approximately 300 mL of old clotted blood in the left chest.

XYZWALKER, KELVION LEON
Enterprise Patient ID: 929725
Medical Record #: 433045 / Account #: 61124433
Operative Report

TRANSCRIPTION DATE/TIME: 12/11/2013 3:15 AM

Page 1 of 4

4

PATIENT NAME: XYZWALKER, KELVION LEON
MRN / ACCOUNT #: 433045 / 61124433
DOB / AGE / SEX: 08/15/1994 / 19Y / M

ADMIT DATE: 12/09/2013
DICTATION DATE/TIME: 12/11/2013 02:40 AM
PROVIDER: HAMILTON, EMMA C. (R)

The patient's abdomen was notable for bowel discontinuity, with no obvious
signs of intestinal leakage. This was resected and a primary anastomosis
performed. The left colon repair was intact. There was still small amount of
oozing from the presacral area, which had Surgicel snow and Evicel placed on
it with adequate control of bleeding. No bleeding noted from along the
internal iliac vein or artery. No leakage of methylene blue into the abdomen
after administration.

INDICATIONS:
This is a 19-year-old male who sustained a gunshot wound to the abdomen on
12/09/2013. He was taken to the operating room and underwent exploratory
laparotomy and left thoracotomy, where he was found to have a left colon
injury, which was repaired primarily; multiple small bowel injuries, which
were resected and bowel was left in discontinuity. The patient had an injury
to the left internal iliac artery and vein, which were ligated and repaired
primarily. The patient also had a moderate amount of sacral hemorrhage and
bleeding from the left psoas muscle. Multiple packs were left in place in this
area and an ABThera wound VAC was placed. The patient had required a left
thoracotomy for crossclamping of the aorta during the initial procedure. He
has since developed a left hemothorax, which needs evacuation. The risks and
benefits of the procedure were explained to the patient's family, who agrees
to proceed.

PROCEDURE IN DETAIL:
The patient was transported from the ICU to the operating room. The patient
was already intubated and further anesthetized with general anesthesia. The
ABThera wound VAC was removed and the patient's chest and abdomen prepped and
draped in sterile standard style. The abdomen was inspected. There were a
moderate amount of adhesions among the small bowel. These were gently broken
up using warm irrigation and blunt dissection. There were two sponges packed
in the abdomen along the aorta and IVC. These were carefully removed and the
aorta and IVC inspected. There was no active bleeding noted. We then directed
our attention towards the left iliac artery repair. There was no bleeding
noted. The left iliac vein where it had been ligated was visible. We were not
able to identify the left ureter, and it was near the area where the left
iliac artery and vein had been injured, so we proceed with injection of
methylene blue. There was no noted leakage of methylene blue into the abdomen
after the urine in the Foley bag had turned light green. We then directed our
attention to the right pelvic sidewall. The right ureter was intact and there
was no injury noted to the right iliac artery or vein. There were 2 packs in
the pelvis down along the sacral plexus, which were carefully removed. There
was still a slow continuous ooze along the presacral venous plexus. A piece of
Surgicel snow was packed into the cavity and Evicel placed on top. Arista
powder was then placed on top of this was adequate control of the oozing. We
then proceeded to run the small bowel from the ligament of Treitz to the LT.

XYZWALKER, KELVION LEON
Enterprise Patient ID: 929725
Medical Record #: 433045 / Account #: 61124433
Operative Report

5

PATIENT NAME: XYZWALKER, KELVION LEON
MRN / ACCOUNT #: 433045 / 81124433
DOB / AGE / SEX: 08/15/1994 / 19Y / M

ADMIT DATE: 12/09/2013
DICTATION DATE/TIME: 12/11/2013 02:40 AM
PROVIDER: HAMILTON, EMMA C. (R)

There was an area of discontinuity, which had been ligated using the LigaSure
device, and there was no seepage of intestinal contents noted. There was a
moderate-size small bowel hematoma involving greater than 50% of the bowel
wall just distal to the area that had been resected. There were no other
injuries noted to the small bowel. We then proceeded with a small bowel
resection. The small bowel just proximal to the area that had been resected
with the LigaSure device was then divided using a GIA 75 stapler. The small
bowel just distal to the area of the hematoma was then resected using a GIA 75
stapler. A side-to-side anti-parallel anastomosis was then performed using the
GIA 75 stapler. The resulting enterostomy was closed using a TA-45 mm stapler.
A crotch stitch was placed using a 3-0 silk, and the mesentery defect was
closed using a running 3-0 Vicryl suture. We then inspected the colon. There
were no injuries noted to the ascending or transverse colon. The left
descending colon had evidence of a primary repair, which was intact. There
were no other injuries noted to the sigmoid colon or rectum. At this time, we
then completed a washout with a total of 6 liters of irrigation. We then
directed our attention to the patient's left thoracotomy site. The sutures
were removed and the incision reopened. There was there was a copious amount
of old clotted blood, which was evacuated. The chest was then irrigated with 3
liters of warm normal saline. There was a small amount of oozing along the
sternum, which was controlled with placing medium size clips. A piece of
Surgicel snow was then packed up into this area. There was still a slow
continuous ooze, and the patient was mildly coagulopathic at this point. We
replaced the 36-French chest tubes with another set of 36-French chest tubes
through the same thoracostomy incision and the ribs were reapproximated using
interrupted #2 Vicryl. The muscle was reapproximated in 2 layers using 2-0
Vicryl suture. The skin was then reapproximated using a running deep dermal
3-0 Vicryl sutures and staples were placed on top. An ABThera wound VAC was
then placed over the abdomen and attached to the suctioned device at a -125
mmHg continuous suction with a good seal. The chest tubes were connected to a
Pleur-evac at -120 cm of water continuous suction with a good seal. A dressing
was applied to the thoracotomy incision site, and the chest tubes. The patient
remained intubated and was transported back up to the ICU in stable condition.
Dr. Carroll was present for the entire case.

<Start Header>
<End Header>

Dictated by: EMMA C. (R) HAMILTON, MD

XYZWALKER, KELVION LEON
Enterprise Patient ID: 929725
Medical Record #: 433045 / Account #: 81124433
Operative Report

TRANSCRIPTION DATE/TIME: 12/11/2013 3:15 AM

Page 3 of 4

PATIENT NAME: XYZWALKER, KELVION LEON
MRN / ACCOUNT #: 433045 / 61124433
DOB / AGE / SEX: 08/15/1994 / 19Y / M

ADMIT DATE: 12/09/2013
DICTATION DATE/TIME: 12/11/2013 02:40 AM
PROVIDER: HAMILTON, EMMA C. (R)

Signed by
James Patrick Carroll. M.D. 12/14/2013 05:50
A

_____
James Patrick Carroll, M.D.

HA/nts/JL#1671/CSDoc#932759115
D: 12/11/2013 02:40 A     T: 12/11/2013 03:15 A     Work Type Entered:

**XYZWALKER, KELVION LEON**
Enterprise Patient ID: 929725
Medical Record #: 433045 / Account #: 61124433
Operative Report
Page 4 of 4
TRANSCRIPTION DATE/TIME: 12/11/2013 3:15 AM

7

BAYLOR UNIVERSITY MEDICAL CENTER

PATIENT NAME: XYZWALKER, KELVION LEON
MRN / ACCOUNT #: 433045 / 61124433
DOB / AGE / SEX: 08/15/1994 / 19Y / M

ADMIT DATE: 12/09/2013
DICTATION DATE/TIME: 12/13/2013 05:55 PM
PROVIDER: Carroll, James Patrick

DATE OF OPERATION:
12/13/2013

PREOPERATIVE DIAGNOSIS:
Gunshot wound to the abdomen.

POSTOPERATIVE DIAGNOSIS:
Gunshot wound to the abdomen.

OPERATIONS PERFORMED:
1. Abdominal washout.
2. Abdominal closure.

SURGEON:
James P. Carroll, MD

ANESTHESIA:
General endotracheal anesthetic by Dr. Simon.

INDICATION:
The patient is a 19-year-old male who sustained a gunshot wound to his abdomen
with loss of vital signs. He received an emergent thoracotomy and exploratory
laparotomy for injuries to his left internal iliac artery and vein. The
patient had previously undergone 2 laparotomies and now presents for a washout
and closure.

Risks and benefits of the procedure were explained to the patient and his
father. All questions were answered, and they requested we proceed with the
operation.

OPERATIVE COURSE IN DETAIL:
The patient was placed supine on the operating room table. After adequate
general endotracheal anesthesia was established, attention was placed on the
abdomen, which was prepped and draped in the standard surgical fashion.
Previously placed Vac dressing was removed. The abdomen was then explored and
copiously irrigated. Hemostasis was noted. The NG tube was felt and was
present within the stomach. The abdomen was then closed in layers. The fascia
was closed using a #1 running PDS suture, followed by skin closure using skin
staples. All sponge and instrument counts were correct at the end of the case.
The patient tolerated the procedure well.

XYZWALKER, KELVION LEON
Enterprise Patient ID: 928725
Medical Record #: 433045 / Account #: 61124433
Operative Report

TRANSCRIPTION DATE/TIME: 12/13/2013 9:59 PM

Page 1 of 2



PATIENT NAME: XYZWALKER, KELVION LEON
MRN / ACCOUNT #: 433045 / 61124433
DOB / AGE / SEX: 08/15/1994 / 19Y / M

ADMIT DATE: 12/09/2013
DICTATION DATE/TIME: 12/13/2013 05:55 PM
PROVIDER: Carroll, James Patrick

:Signed by
James Patrick Carroll, M.D. 12/14/2013 05:50
A


James Patrick Carroll, M.D.

/nts/JL#3195/CSDoc#932762243
D: 12/13/2013 05:55 P      T: 12/13/2013 09:59 P      Work Type Entered:

XYZWALKER, KELVION LEON
Enterprise Patient ID: 929725
Medical Record #: 433045 / Account #: 61124433
Operative Report

Page 2 of 2

TRANSCRIPTION DATE/TIME: 12/13/2013 9:59 PM

9



PRiME
Diagnostic Imaging

*This facility is Accredited by the American College of Radiology (ACR) for CT, MRI, and Nuclear Medicine*

**12840 Hillcrest Plaza Dr., Suite E100, Dallas, TX 75230**

(214) 341-8770
Fax (214) 341-1603

| | |
|---|---|
| **PATIENT NAME:** | **WALKER, KELVION** |
| **DATE OF SERVICE:** | **1/20/2014** |
| **CHART#:** | **152453** |
| **DATE OF BIRTH:** | **8/15/1994** |
| **REFERRING PHYSICIAN:** | **CAWTHON, DEBORAH DO** |

### MRI LUMBAR SPINE

**CLINICAL HISTORY:** Low back pain.

**TECHNIQUE:** Noncontrast magnetic resonance images of the lumbar spine are obtained.

**FINDINGS:** The conus and cauda equina nerve roots have an unremarkable appearance. Presacral heterogeneous collection as described on MRI pelvis study performed on same date, most typical of a hematoma.

Lumbar alignment and lordosis are preserved.

Level-by-level evaluation:

L5-S1: 2 mm broad-based central protrusion. No canal or foraminal stenosis.

L4-L5: 1-2 mm focal central protrusion. No canal or foraminal stenosis.

L3-L4: No canal or foraminal stenosis.

L2-L3: No canal or foraminal stenosis.

L1-L2: No canal or foraminal stenosis.

T12-L1: No canal or foraminal stenosis.

**IMPRESSION:**

1. CENTRAL PROTRUSION AT L5-S1 AND L4-L5. NO CANAL OR FORAMINAL STENOSIS.

2. PRESACRAL HETEROGENEOUS COLLECTION, MOST LIKELY REPRESENTATIVE OF A HEMATOMA. STERILITY CANNOT BE ASSESSED ON THE BASIS OF THIS EXAM.

**MICHAEL LLOYD, M.D.**
nc D:1/21/2014 9:08:10 AM T: 1/21/2014 11:16 AM
PRELIMINARY



EXHIBIT
3



This facility is Accredited by the American College of Radiology (ACR) for CT, MRI, and Nuclear Medicine

**12840 Hillcrest Plaza Dr., Suite E100, Dallas, TX 75230**

(214) 341-8770
Fax (214) 341-1603

**PATIENT NAME:**         **WALKER, KELVION**
**DATE OF SERVICE:**      **1/20/2014**
**CHART#:**               **152463**
**DATE OF BIRTH:**        **8/15/1994**
**REFERRING PHYSICIAN:**  **CAWTHON, DEBORAH DO**

**MRI PELVIS**

CLINICAL HISTORY: Pelvic pain.

TECHNIQUE: Noncontrast magnetic resonance images of the pelvis are obtained.

FINDINGS: There is a presacral intrinsically T1 hyperintense fluid collection with heterogeneous T2 signal that measures 7.3 x 2.9 x 3.6 cm. The signal characteristics are typical of a hematoma.

No pelvic fracture is identified. No avascular necrosis or fracture of the hips. The SI joints, os pubis, and sacrum are unremarkable.

No labral tear is identified. Regional myotendinous anatomy unremarkable. Bullet in the right gluteal soft tissues.

IMPRESSION:

1. PRESACRAL FLUID COLLECTION, MOST TYPICAL OF A HEMATOMA. STERILITY CANNOT BE ASSESSED ON THE BASIS OF IMAGING.

2. BULLET IN THE RIGHT GLUTEAL SOFT TISSUES.

3. NO EVIDENCE OF FRACTURE OR AVASCULAR NECROSIS.

MICHAEL LLOYD, M.D.
no D:1/21/2014 9:03:46 AM T: 1/21/2014 11:06 AM·
PRELIMINARY



EXHIBIT
4

Sign Up

Email or Phone          Password                    Log In
☐ Keep me logged in        Forgot your password?

## Chief David O. Brown Disciplines Employees
December 30, 2013 at 1:38pm

Dallas Police Chief David O. Brown disciplined the following officers during hearings this morning.



**Notes by Dallas Police Department**
All Notes

Get Notes via RSS
Embed Post

1. 911 Call Taker Moises Limon, #107901, was involved in the following incident:

On May 13, 2013, 911 Call Taker Limon was arrested for Driving While Intoxicated (DWI) in the City of Carrolton. Mr. Limon did not notify his supervisors of his DWI arrest. An Internal Affairs Investigation concluded that Mr. Limon drove a vehicle while under the influence of alcohol and failed to report the arrest to his supervisors.

911 Call Taker Limon was terminated for his actions. He was hired in July of 2007 and was assigned to the Communications Services Section.

2. Senior Corporal Frank Della, #7103, was involved in the following incident:

On September 7, 2013, Senior Corporal Della while off-duty attended a concert during which time he consumed alcoholic beverages. After the concert, he picked up a parking barricade in the parking lot and threw it, striking a parked vehicle. The owners of the vehicle, a male and female, observed the incident as they approached their vehicle. A verbal argument ensued between Senior Corporal Della and the owners, at which time Senior Corporal Della grabbed the female by the shoulders. Senior Corporal Della produced his badge and identified himself as a police officer to the couple and then walked away while the female called 911. While the couple followed him through the parking lot, Senior Corporal Della stopped and took a physical stance towards the couple to fight. The confrontation drew the attention of security officers. One of the security officers stated that he had to physically restrain Senior Corporal Della from fighting with the male. Shortly after a supervisor arrived at the scene, Senior Corporal Della stopped cooperating with the investigation. Multiple officers and witnesses stated that Senior Corporal Della was intoxicated or under the influence of alcohol. He was offered a field sobriety test which he refused.

Senior Corporal Della was arrested for Public Intoxication, Class B Misdemeanor Criminal Mischief, and Class C Misdemeanor Assault. An Internal Affairs Investigation concluded that on September 7, 2013, Senior Corporal Della was intoxicated while in public view, engaged in adverse conduct when he caused damage to another person's vehicle, made offensive contact with another person, and was involved in a disturbance which resulted in a police response.

Senior Corporal Della was terminated for his actions. He was hired in August of 1994 and was assigned to the North Central Patrol Division.

3. Senior Corporal James Reynolds, #7462, was involved in the following incident:

On May 29, 2013, Senior Corporal Reynolds was on a meal break with his recruit at a location near a shopping center where an off-duty officer was working. The off-duty officer requested assistance over the police radio for help with a combative prisoner. Several officers marked enroute to the location in emergency status with lights and sirens activated.

A supervisor who was monitoring the Automated Vehicle Locator map during the incident noticed Senior Corporal Reynolds, who was approximately three tenths of a mile from the location, did not respond to the request for assistance. The recruit officer with Senior Corporal Reynolds stated that he heard the call and believed the officer calling for assistance sounded stressed and excited, but he was told by Senior Corporal Reynolds that they were not going to respond to the call. Senior Corporal Reynolds told the supervisor that he did not hear anything on the radio to indicate the call was an assist officer, and since other officers were responding, he told his recruit that they would not respond. An Internal Affairs Investigation concluded that Senior Corporal Reynolds failed to aid a fellow officer.



**EXHIBIT**

**5**

Senior Corporal Reynolds was demoted to the rank of police officer for his actions. He was hired in September of 1996 and was assigned to the Southwest Patrol Division.

4. Senior Corporal William Wesley, #5923, was involved in the following incident:

On July 28, 2013, Senior Corporal Wesley became involved in a disturbance with his live-in girlfriend. During the disturbance a physical fight ensued and Senior Corporal Wesley struck his girlfriend in the head with his hands. Grand Prairie police responded to a 911 call at the location from Senior Corporal Wesley's girlfriend. Their investigation resulted in the arrest of Senior Corporal Wesley for Family Violence Assault, Class A Misdemeanor. An Internal Affairs investigation concluded that Senior Corporal Wesley engaged in adverse conduct when he was involved in a domestic disturbance which resulted in a police response.

Senior Corporal Wesley was terminated for his actions. He was hired in November of 1988 and was assigned to the Southwest Patrol Division.

5. Sergeant Rafael Rodriguez, #7254, was involved in the following incident:

On November 13, 2013, Sergeant Rodriguez became involved in a disturbance with his estranged wife at her residence. Sergeant Rodriguez confronted his estranged wife and a male individual as they walked out of the garage. A verbal altercation ensued at which time Sergeant Rodriguez went to his vehicle and retrieved a handgun. Sergeant Rodriguez displayed the weapon in a threatening manner and made threats towards his estranged wife. Grapevine police responded and subsequently made a Deadly Conduct charge against Sergeant Rodriguez. On December 19, 2013, Sergeant Rodriguez was arrested. An Internal Affairs investigation concluded that Sergeant Rodriguez engaged in adverse conduct when he was involved in a disturbance which resulted in a police response and subsequent arrest for Deadly Conduct. The investigation also concluded that Sergeant Rodriguez was armed with a weapon which he was not qualified to carry.

Sergeant Rodriguez was terminated for his actions. He was hired in Auigust 1995 and was assigned to the Northwest Patrol Division.

6. Senior Corporal Amy Wilburn, #8111, was involved in the following incident:

On December 9, 2013, Senior Corporal Wilburn and other officers drove behind a vehicle that they had been told was taken in an earlier robbery by armed suspects who had fired shots at the owner of the vehicle. While the vehicle was moving slowly, the driver jumped out and began running and the passenger remained inside the vehicle. The other officers began to pursue the driver while Senior Corporal Wilburn ran toward the vehicle with her weapon still holstered. As Senior Corporal Wilburn opened the driver's door, she appeared surprised at the sight of the suspect sitting in the passenger seat and almost immediately drew her weapon and fired once, striking the suspect once in the side. The Internal Affairs investigation concluded that Senior Corporal Wilburn violated the Department's Use of Deadly Force policy when she fired upon an unarmed person without fear or justification. This conclusion is based upon the following:

- An independent witness that observed the entire shooting incident stated that the suspect, Mr. Walker, was sitting upright and had his hands up in the air the entire time, indicating surrender. The witness stated at no time did Mr. Walker lower his hands until after he was shot.

- No weapon or contraband was found in the location where Senior Corporal Wilburn indicated the suspect, Mr. Walker, was hiding his hand.

- At no time after the vehicle was located, did officers lose sight of the vehicle nor broadcast that any suspect had exited the vehicle until Officer Terry reported that the driver fled from the vehicle on foot.

- Senior Corporal Wilburn did not conduct a felony traffic stop to clear or challenge the vehicle, which contained possibly armed suspects.

- Senior Corporal Wilburn rushed the vehicle and did not maintain distance without taking the time a reasonable officer would approaching a vehicle with armed suspects.

- Senior Corporal Wilburn approached the vehicle alone after observing Officers Terry and Correa pursue the driver of the suspect vehicle.

- After opening the driver's door of a still moving vehicle, Senior Corporal Wilburn observed Mr. Walker in the passenger seat and immediately drew and fired her weapon.

- Senior Corporal Wilburn immediately holstered her weapon and did not stay on target as a reasonable officer would with a potentially armed and dangerous suspect.

- Officer Wilburn immediately entered the vehicle without proper cover or with her weapon at the ready under the same circumstances that a reasonable officer in fear of their life would approach an armed suspect.

- As she arrived at the passenger door of the suspect, whom she believed to have a weapon, she exposed herself to the possibly armed suspect without her weapon drawn and not in a tactical manner and before the vehicle had been cleared for weapons. A reasonable officer in fear for their safety would not have approached the vehicle in this manner.

- Mr. Walker stated that he had his hands in the air when Senior Corporal Wilburn approached the vehicle. He stated he was not resisting and was not reaching for anything.

Senior Corporal Wilburn was terminated for her actions. She was hired in September 2001 and was assigned to the Southeast Patrol Division.

Under civil service rules, all employees have the right to appeal their discipline.

As in all officer involved shooting incidents, this case will be referred to the Dallas County District Attorney's office for presentation to the Grand Jury.

| Mobile | Find Friends | Badges | People | Pages | Places | Apps | Games | Music |
| About | Create Ad | Create Page | Developers | Careers | Privacy | Cookies | Terms | Help |

Facebook © 2014 · English (US)

https://www.facebook.com/notes/dallas-police-department/chief-david-o-brown-disciplines-...  1/3/2014

The below video is dash cam footage... - Dallas Police Department | Facebook

Sign Up

Email or Phone
maryameter@yahoo.com
☐ Keep me logged In

Password

Log In

Forgot your password?

 **Dallas Police Department** · 26,744 like this
January 14 at 1:51pm ·

The below video is dash cam footage retrieved from Officer Amy Wilburn's patrol vehicle which was recorded during the shooting incident in which she was involved at 9500 Military Parkway on December 9th, 2013.

The following account is summarized from the Internal Affairs investigation.

All radio transmissions indicated that the suspect vehicle was occupied by multiple individuals. Officer Wilburn transmitted over the radio she had observed multiple suspects passing her location and these suspects matched the description given by fellow officers.

At no time after the vehicle was located did officers lose sight of the vehicle, nor broadcast that any suspect had exited the vehicle until another officer reported that the driver of the vehicle fled on foot. The video shows Officer Wilburn did not conduct a felony "high risk" traffic stop to clear or challenge the vehicle, which reportedly contained multiple suspects who were possibly armed. Officer Wilburn is seen running to the vehicle and not maintaining distance or taking the time a reasonable officer would while approaching a vehicle with armed suspects.

Officer Wilburn approached the vehicle alone after two other officers began to chase the driver of the suspect vehicle on foot. Officer Wilburn approached the vehicle without proper cover or with her weapon at the ready position. A reasonable officer in fear for their safety would not have approached a vehicle containing possible armed suspects in this manner. Officer Wilburn opened the driver's side door of the still moving vehicle, observed Mr. Kelvion Walker in the passenger seat and immediately drew and fired her weapon. As she approached the passenger door where Mr. Walker was seated, she exposed herself to a possibly armed suspect, an action which a reasonable officer in fear for their safety would not have done.

Officer Wilburn dropped her weapon in the car before running to the passenger side. In the video, a second officer is seen reaching into the vehicle, removing Officer Wilburn's gun and handing it to her over the roof of the car. Officer Wilburn then holstered her gun and failed to stay on target as a reasonable officer would have with a potentially armed and dangerous suspect. Mr. Walker stated he had his hands in the air when Officer Wilburn approached the vehicle and was not resisting nor reaching for anything. An independent witness who observed the entire incident stated Mr. Walker had his hands up in the air the entire time, indicating surrender, and did not lower his hands until he was shot. After the shooting incident, a search was made of the vehicle and no weapons or contraband were found in the location.

 **Officer Involved Shooting**
www.youtube.com

Facebook © 2014
English (US) · Privacy · Terms · Cookies · More

**EXHIBIT**

**6**

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

KELVION WALKER,               )
                              )
          Plaintiff,          )
                              )
VS.                           )     3:13-CV-04896-D
                              )
AMY WILBURN,                  )
                              )
          Defendant.          )

VIDEOTAPED ORAL DEPOSITION OF

THOMAS LAWRENCE

SEPTEMBER 23, 2014

VIDEOTAPED ORAL DEPOSITION OF THOMAS LAWRENCE, produced as a witness at the instance of the Plaintiff, and duly sworn, was taken in the above-styled and numbered cause on the 23rd day of September, 2014, from 9:27 a.m. to 4:26 p.m., before Jill Allen, CSR in and for the State of Texas, reported by machine shorthand, at the Dallas City Attorney's Office, 1500 Marilla Street, in the City of Dallas, County of Dallas, State of Texas, pursuant to Notice and the Federal Rules of Civil Procedure.



EXHIBIT
7

|            |    |                                                        |
|------------|----|--------------------------------------------------------|
|            | 1  | MR. BRANDT:  Let me take a real quick                  |
|            | 2  | break.  I think I'm going to pass the witness after    |
|            | 3  | that.                                                  |
|            | 4  | VIDEOGRAPHER:  We're off the record.  The              |
| 04:06:57   | 5  | time is 4:07 p.m.                                       |
|            | 6  | (Recess taken 4:07-4:09.)                              |
|            | 7  | VIDEOGRAPHER:  We're back on the record.               |
|            | 8  | The time is 4:09 p.m.                                   |
|            | 9  | MR. BRANDT:  Thank you for your time, and              |
| 04:08:35   | 10 | I'll pass the witness at this time.                    |
|            | 11 | FURTHER EXAMINATION                                     |
|            | 12 | BY MR. HENLEY:                                          |
|            | 13 | Q.  Assistant Chief, I appreciate your patience.       |
|            | 14 | I do have some questions to ask you.  I hope we can move|
| 04:08:47   | 15 | this along pretty quickly.                             |
|            | 16 | During Counsel's examination of you, you               |
|            | 17 | expressed an opinion about Officer Wilburn's conduct   |
|            | 18 | bordering on reckless.  Do you remember that?          |
|            | 19 | A.  Uh-huh.                                             |
| 04:09:03   | 20 | Q.  Specifically, what conduct did you refer to as     |
|            | 21 | being reckless?                                         |
|            | 22 | A.  I think she had a -- I'll do the same thing         |
|            | 23 | before I break it in two pieces.  I really believe     |
|            | 24 | leading up to the event, she violated so many of our   |
| 04:09:22   | 25 | rules and procedures that exposed herself to an        |

|  |  |
|---|---|
| | 1 | unnecessary situation. |
| | 2 | I believe at the point the shooting occurred, |
| | 3 | she just -- I just don't believe she was justified -- I |
| | 4 | don't believe there was reasonable belief that she |
| 04:09:39 | 5 | had -- let me word this the right way.  I don't think |
| | 6 | she was reasonably in fear to the level that we expect a |
| | 7 | reasonable officer to be. |
| | 8 | Q.   And how would you characterize that as |
| | 9 | reckless? |
| 04:09:55 | 10 | MR. BRANDT:   Objection, form. |
| | 11 | A.   I think the issue of her -- the reckless part |
| | 12 | of it characterizes the context of the whole event, not |
| | 13 | just the one shooting.  The jumping out, running up |
| | 14 | there, immediately engaging, not doing the things that |
| 04:10:11 | 15 | we teach them to do, not taking any kind of safety |
| | 16 | precautions, that's -- taken as a whole, I believe that |
| | 17 | was just a -- in terms of -- I'm not using the term |
| | 18 | reckless in terms of the legal term you're used to; in |
| | 19 | reasonable terms the way police act, that she acted |
| 04:10:28 | 20 | recklessly as far as police conduct would be concerned. |
| | 21 | I believe it was kind of careless disregard for the |
| | 22 | rules and procedures and stuff. |
| | 23 | Q.   You had pointed out an instance where an |
| | 24 | officer had shot an unarmed man but that unarmed man was |
| 04:10:47 | 25 | actually choking the officer. |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

KELVION WALKER
    Plaintiff

v.                   §   CAUSE NO. 3-13-cv-04896-D
                    §     (Judge Fitzwater)

AMY WILBURN
    Defendant

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL AND VIDEOTAPED DEPOSITION OF

GLORIA PEREZ

September 29, 2014

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL AND VIDEOTAPED DEPOSITION OF

GLORIA PEREZ, produced as a witness at the instance of

the Defendant, and duly sworn, was taken in the above

styled and numbered cause on the 29th day of September,

2014, from 11:05 a.m. to 5:08 p.m., before Jill Johnson,

CSR in and for the State of Texas, reported by machine

shorthand, at the Dallas City Attorney's Office, 1500

Marilla Street, Dallas, Dallas County, Texas, pursuant

to the Federal Rules of Civil Procedure and the

provisions stated on the record or attached hereto.



EXHIBIT
8

1    different things that were done.

2        Q.   Okay.  That's talking about the factual

3    findings that supported --

4        A.   Right.  And that's what I read.

5        Q.   Okay.  But let's -- the facts -- what I'm

6    trying to get at is what portions of the policy were

7    violated that you found.  And you've told me that these

8    are the facts, starting on the bottom of Page 24, these

9    are the facts that support your belief that there were

10   policy violations; right?

11       A.   Um-hum.

12       Q.   Yes?

13       A.   Um-hum.  Correct.  Yes.

14       Q.   So you've only listed two policy violations

15   for me.  One is the reasonably perceives and the

16   reasonable alternatives.

17       A.   Okay.  Under C, "Avoiding the Use of Deadly

18   Force," it has:  At a point when an officer should

19   reasonably perceive the potential exists that deadly

20   force may be an outcome, that officer must use

21   reasonable alternatives if time and opportunities

22   permit.

23            We are taught, you know, not to rush into

24   the vehicle, maintain a distance, and that's what that's

25   talking about.  In other words, could there have been a

GLORIA PEREZ

 1    way for the officer to pull away and try to avoid that

 2    deadly force or any deadly force confrontation.

 3                   Also on the use of force, the

 4    authorization to use the force, we will only use deadly

 5    force to protect ourselves and another person from

 6    imminent death or serious bodily injury.  When she

 7    rushed into that vehicle, approached that vehicle, the

 8    radio communications that came before that said that

 9    there were armed suspects involved.  So rushing into

10    that was something that we don't do, according to the

11    use of force policy.

12         Q.   Anything else?

13         A.   No, sir.

14         Q.   Okay.  Now, I'm not sure if I've got this

15    right, but let me -- so you've got four things, four

16    violations of the deadly force policy; right?  One had

17    to do with reasonably perceives.  That's on Page 23.  If

18    it's easier to look --

19         A.   Yes.

20         Q.   -- on page -- if you look at Exhibit 20, it

21    might be easier for you to manage.

22         A.   Okay.

23         Q.   Okay.  That's -- that's the one, one of the --

24    the first violation is reasonably perceived.  The second

25    one you talked about was reasonable alternatives.